BUCHALTER LLP
CHRISTINA M. MORGAN (SBN: 277877)
655 West Broadway, Suite 1600
San Diego, CA 92101
Telephone: 619.219.5335
Email: cmorgan@buchalter.com

BUCHALTER LLP
ARTIN BETPERA (SBN: 244477)
TRICIA A. PHAM (SBN: 305420)
18400 Von Karman Ave., Suite 800
Irvine, CA 92612
Telephone: 619.760.1121
Email: abetpera@buchalter.com
Email: tpham@buchalter.com

Attorneys for Defendant
WANTABLE, INC., a Wisconsin corporation
d/b/a WWW.WANTABLE.COM

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>WANTABLE, INC., a Wisconsin corporation, d/b/a WWW.WANTABLE.COM,<br><br>Defendant. | Case No. 25CV2267 AGS MMP<br><br>**DEFENDANT'S AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE A FORUM SELECTION CLAUSE**<br><br>Date: April 22, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Andrew G. Schopler |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................... 6

II. RELEVANT FACTUAL BACKGROUND ......................................... 6

    A. Defendant Wantable Operates an Online Personal Styling Service ..... 6

    B. Plaintiff Purchased a Subscription From Wantable and Paid for one (1) Shipment of Products .................................................... 9

    C. Plaintiff Improperly Filed her Claims Against Wantable in This Court, in Violation of the T&C's Forum Selection Clause ................. 9

III. THIS COURT HAS AUTHORITY TO TRANSFER THIS ACTION TO ENFORCE THE FORUM SELECTION CLAUSE ..................................... 10

IV. THE FORUM SELECTION CLAUSE IN WANTABLE'S T&C'S IS VALID AND ENFORCEABLE ...................................................... 11

    A. The Forum Selection Clause is Part of a Binding Sign-In Wrap Agreement ........................................................................ 11

        i. The Transactional Context Strongly Supports the Existence of a Binding Agreement between Plaintiff and Wantable ........ 13

        ii. Wantable's Check Out Page Provided Plaintiff With Reasonable Notice of Wantable's Terms & Conditions .......... 14

        iii. Plaintiff Manifested Assent to Wantable's Terms ................... 16

    B. Plaintiff Cannot Rebut the Presumption That the Forum Selection Clause is Valid ............................................................ 17

        i. The Forum Selection Clause Applies to Plaintiff's Claims ..... 18

        ii. There is no Evidence of Fraud or Overreaching ..................... 18

        iii. The Forum Selection Clause Does not Deny Plaintiff her day in Court ................................................................... 19

        iv. Enforcement of the Forum Selection Clause Would not Violate Public Policy ........................................................ 20

V. IN THE ALTERNATIVE, THIS COURT SHOULD STAY THE ACTION PENDING WANTABLE'S PETITION TO COMPEL ARBITRATION IN THE EASTERN DISTRICT OF WISCONSIN .......... 21

VI. CONCLUSION ................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allied Professionals Ins. Co. v. Harmon*,
  2017 U.S. Dist. LEXIS 216872 (C.D. Cal. July 28, 2017) ............................... 22

*Atlantic Marine Const. Co., Inc. v. United States Dist. Ct. for Western Dist. of Texas*,
  571 U.S. 49 (2013) ................................................................. 6, 11, 20

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991) ..................................................................... 19

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
  16 F.Supp.3d 1123 (S.D. Cal. 2014) ...................................................... 18

*Continental Grain Co. v. Dant & Russell, Inc.*,
  118 F.2d 967 (9th Cir. 1941) ......................................................... 21, 22

*Cordas v. Uber Techs., Inc.*,
  228 F.Supp.3d 985 (N.D. Cal. 2017) ...................................................... 16

*Crawford v. Beachbody, LLC*,
  No. 14cv1583-GPC-KSC, 2014 WL 6606563 (S.D. Cal. Nov. 5. 2014) ........................................................................ 16

*Keebaugh v. Warner Bros. Ent. Inc.*,
  100 F.4th 1005 (9th Cir. 2024) ....................................................... 12, 15

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1971) ............................................................. 11, 17, 18, 19

*Maynez v. Walmart, Inc.*,
  479 F.Supp.3d 890 (C.D. Cal. 2020) ...................................................... 15

*Meras Engineering, Inc. v. CH2O, Inc.*,
  2013 WL 146341 (N.D. Cal. Jan. 14, 2013) ................................................ 20

*Murphy v. Schneider Nat'l, Inc.*,
  362 F.3d 1133 (9th Cir. 2004) ........................................................ 17, 19

*Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.*,
    741 F.2d 273 (9th Cir. 1984) ............................................................................ 21

*Richards v. Lloyd's of London*,
    135 F.3d 1289 (9th Cir. 1998) .......................................................................... 17

*In re Ring LLC Privacy Litig.*,
    2021 WL 2621197 (C.D. Cal. June 24, 2021) ................................................ 15

*Rodriguez v. Experian Servs. Corp.*,
    2015 WL 12656919 (C.D. Cal. Oct. 5, 2015) ................................................. 15

*Russel v. De Los Suenos*,
    No. 13-CV-2081-BEN-DHB, 2014 WL 1028882 (S.D. Cal. 2014) ................. 19

*Seaman v. Priv. Placement Cap. Notes II, LLC*,
    2017 U.S. Dist. LEXIS 47121 (S.D. Cal. Mar. 29, 2017) ............................... 22

*Spradlin v. Lear Siegler Management Services Co., Inc.*,
    926 F.2d 865 (9th Cir. 1991) ............................................................................ 20

*Textile Unlimited, Inc. v. A. BMH & Co.*,
    240 F.3d 781,785 (9th Cir. 2001) .................................................................... 22

*White v. Ring LLC*,
    2023 WL 1097554 (C.D. Cal. Jan. 25, 2023) ................................................. 15

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
    901 F.3d. 1081 (9th Cir. 2018) ......................................................................... 17

**State Cases**

*B.D. v. Blizzard Ent., Inc.*,
    76 Cal.App.5th 931 (2022) ......................................................................*passim*

*Golden Eagles Ins. Co. v. Foremost Ins. Co.*,
    20 Cal.App.4th 1372 (1993) ............................................................................ 16

*Harris v. TAP Worldwide, LLC*,
    248 Cal.App.4th 373 (2016) ............................................................................ 16

*HM DG, Inc. v. Amini*,
    219 Cal.App.4th 1100 (2013) .......................................................................... 16

*Sellers v. JustAnswer LLC,*
    73 Cal.App.5th 444 (2022) ................................................................. 13

**Federal Statutes**

28 U.S.C. § 1404(a) .............................................................................. 10

28 U.S.C. § 1406(a) .............................................................................. 10

Federal Arbitration Act ................................................................. 6, 21, 22

**State Statutes**

Cal. Civil Code § 1750 *et seq.* .............................................................. 10

Civ. Code, § 1584 ................................................................................. 16

False Advertising Law .......................................................................... 10

Unfair Competition Law ........................................................................ 10

**Other Authorities**

http://www.wantable.com ........................................................................ 6

I.    **INTRODUCTION**

"[A] forum-selection clause must be given "controlling weight in all but the most exceptional cases." *Atlantic Marine Const. Co., Inc. v. United States Dist. Ct. for Western Dist. of Texas,* 571 U.S. 49, 63 (2013).

Plaintiff Rebekah Rodriguez ("Plaintiff") filed the instant lawsuit seeking monetary damages from Defendant Wantable, Inc. ("Wantable") for its purported failure to disclose "automatic" recurring charges associated with Plaintiff's Wantable subscription for monthly delivery of apparel. (Complaint, ¶ 29.) Alleging three causes of action under California law, Plaintiff conveniently fails to mention that she had agreed to be bound by Wantable's Terms and Conditions ("T&Cs") a mere three months before filing this instant action. The T&Cs unambiguously require Plaintiff to arbitrate "[a]ny disputes relating in any way to [Plaintiff's] visit to, or use of, [Wantable's website]…the products [Plaintiff] purchase[d] through the Site (including a subscription), or to [Plaintiff'] relationship to Wantable" in Milwaukee, Wisconsin. (Ex. 5, Section 24, attached to the Declaration of Leslie Jaeschke filed concurrently herewith.) Pursuant to the parties' agreement, this Court is the incorrect forum to adjudicate Plaintiff's claims against Wantable.

Accordingly, Wantable respectfully requests that this Court transfer this matter to the Eastern District of Wisconsin ("Eastern District") or, alternatively, stay the matter while Wantable petitions the Eastern District[1] for an order compelling arbitration in Milwaukee County.

II.    **RELEVANT FACTUAL BACKGROUND**

A.    **Defendant Wantable Operates an Online Personal Styling Service**

Defendant Wantable, Inc. is a Wisconsin corporation based in Milwaukee, Wisconsin. (Jaeschke Decl., ¶ 2.)  Wantable operates the web platform http://www.wantable.com (the "Website"), where customers (or "Members") can

---

[1] As addressed in Section V, *infra*, Wantable must file a petition to compel arbitration in the Eastern District because, under the Federal Arbitration Act, this Court cannot compel arbitration outside of California.

subscribe to specific Edits (i.e., different genres of clothing) and get curated boxes of women's and men's apparel shipped to their doorsteps. Wantable tailors each delivered box to the Member's preferences and in accordance with the terms of their subscription plans. Wantable provides the following explanation of its general business model on the Website:

> Pick a category (Style, Active, Sleep & Body or Men's Active) and take a quick quiz. There is a $20 styling fee which is applied to any purchase made from your Edit…Your expert personal stylist handpicks 9 items based on your preferences, size and budget. These are shipped to you free…You get 5 days to try on your stylist selects in the comfort of your own home, keep only what you love — return the rest. You only pay for items you keep.

(Jaeschke Decl., ¶ 3.)

To obtain Wantable's services, a prospective Member must access the Website, create an account, enroll in one of Wantable's subscription plans, and place an order. Wantable's services are accessible only with a subscription, and the subscription is not active until the Member places their first order. (*Id.*, ¶¶ 4-7.)

To complete an order, the Member must actively click an orange-colored "Place Order" button on the "Secure Checkout" page of the Website. Immediately under the "Place Order" button is the illuminated notice, "By clicking 'place order' you accept monthly recurring orders and our Terms & Conditions. Your recurring orders can be canceled anytime from your account, email, or by calling us." "Terms & Conditions" is hyperlinked, underlined, and in orange-colored font, setting it apart from the rest of the text, which is black. When a Member clicks on

///
///
///
///
///
///

the hyperlink, a full copy of the operative T&Cs appears in a new window for the Member to review. (Jaeschke Decl., ¶¶ 7-8.)



Section 24 of the T&Cs governs any disputes relating to the T&Cs and requires that any such dispute be arbitrated in Milwaukee, Wisconsin:

> Any dispute relating in any way to your visit to, or use of, the Site or the App, to the products you purchase through the Site (including a subscription), or to your relationship to Wantable shall be submitted to confidential arbitration in Milwaukee, Wisconsin; provided, however, that to the extent that you have in any manner violated or threatened to violate our intellectual property rights, we may seek injunctive or other appropriate relief in any state or federal court in the State of Wisconsin. You hereby consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in the state and federal courts of Wisconsin. Arbitration under these Terms will be conducted pursuant to the Commercial Arbitration Rules then prevailing at the American Arbitration Association.

(Jaeschke Decl., ¶ 11, Ex. 5, Section 24, emphasis added.)

Members may cancel their subscriptions at any time by accessing their account dashboards on the Website. (Jaeschke Decl., ¶ 6, Ex. 3.)

**B.** **Plaintiff Purchased a Subscription From Wantable and Paid for one (1) Shipment of Products**

Plaintiff Rebeka Rodriguez created an account with Wantable on or about June 5, 2025 via the Website and purchased a subscription plan with monthly deliveries. (Sobrilsky Decl., ¶ 4.) In placing her first order, Plaintiff agreed to be bound by Wantable's T&Cs. (*See* Jaeschke Decl., ¶¶ 7-8.) Wantable's records indicate that Plaintiff paid for the first curated box (i.e., a $20.00 styling fee plus applicable taxes) and was subsequently billed the retail value for all items in that box, which Plaintiff opted to keep. (*Id.*, ¶¶ 4, 7.)

Plaintiff canceled her subscription approximately one month later on July 5, 2025, and as a result, Plaintiff was never charged any recurring fees. (*Id.,* ¶¶ 8-9.) Additionally, Wantable has no record of receiving any communications from Plaintiff either in writing or via its customer service telephone line regarding any unauthorized charges to Plaintiff's credit card associated with her Wantable subscription. (*Id.*, ¶ 10.)

**C.** **Plaintiff Improperly Filed her Claims Against Wantable in This Court, in Violation of the T&C's Forum Selection Clause**

Plaintiff filed the instant lawsuit two months after cancelling her subscription, alleging that Wantable billed Plaintiff for fees as part of an automatic renewal process without providing clear disclosures regarding the automatic renewal or continuous service offer terms, the cancellation policy, and information regarding how to cancel. (Complaint, ¶¶ 1, 29.) Oddly enough however, Plaintiff's subscription with Wantable was never renewed and certainly not "automatically" renewed. (Sobrilsky Decl., ¶¶ 8-9.) Plaintiff was not charged for a second shipment of products or a second month of styling fees. (*Id.*, ¶ 10.) Still, Plaintiff alleges three causes of action against Wantable in connection with her use of the Website

and services: (1) violation of the Consumers Legal Remedies Act, Cal. Civil Code §1750 *et seq.*; (2) violation of False Advertising Law; and (3) violation of Unfair Competition Law. (*See generally* Complaint.)

Because Plaintiff's claims unquestionably relate to her "visit to, or use of, the [Website]" and "to the products [Plaintiff] purchase[d] through the Site (including a subscription)" <u>and</u> "to [Plaintiff's] relationship to Wantable[,]" Plaintiff is required to arbitrate her individual claims via confidential arbitration <u>in Milwaukee, Wisconsin</u>. (Jaeschke Decl., ¶ 11, Ex. 5, Section 24.) In contravention of the forum selection clause in the T&Cs, Plaintiff improperly filed her claims in this Court as part of blatant efforts to forum shop and avail herself to the laws of a different jurisdiction.

For the reasons set forth herein, this Court should transfer the action to the agreed-upon venue—the Eastern District of Wisconsin ("Eastern District")—or stay the instant action to allow Wantable to petition the Eastern District for an order compelling arbitration.

## III.    THIS COURT HAS AUTHORITY TO TRANSFER THIS ACTION TO ENFORCE THE FORUM SELECTION CLAUSE

Venue in this Court is improper where the parties have previously entered into a valid agreement containing a mandatory forum selection clause. Transfer on the grounds of improper venue is thus appropriate where the parties to the litigation have previously consented to litigate such a matter before another forum. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a) (emphasis added). *See also* 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.")

## IV.    THE FORUM SELECTION CLAUSE IN WANTABLE'S T&C'S IS VALID AND ENFORCEABLE

Forum selection clauses are <u>presumed valid</u>, and enforcement will be ordered unless it clearly would be "unreasonable and unjust, or the clause was invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1971). The party seeking to prevent transfer bears the heavy burden of proving why transfer should not occur in the face of an agreed forum selection clause. *Atlantic Marine Const. Co., Inc. v. United States Dist. Ct. for Western Dist. of Texas,* 571 U.S. 49, 63 (2013). Here, Plaintiff cannot meet her burden of proof, because she had actual notice of Wantable's T&Cs and agreed to be bound.

### A.    The Forum Selection Clause is Part of a Binding Sign-In Wrap Agreement

Wantable's T&Cs are valid and binding. "While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *B.D. v. Blizzard Ent., Inc.*, 76 Cal.App.5th 931 (2022). As explained by the court in *Blizzard*,

> In the world of paper contracting, the outward manifestation of assent as to the same thing by both parties is often readily established by the offeree's receipt of the physical contract. By contrast, when transactions occur over the internet, there is no face-to-face contact and the consumer is not typically provided a physical copy of the contractual terms. In that context, and in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the same thing, which occurs only when the website puts the consumer on constructive notice of the contractual terms. Thus, in order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button.

1  *Blizzard*, 76 Cal.App.5th at 943-44 (internal quotations and citations omitted).

2      Within this framework, "[m]ost courts now have identified at least four types

3  of internet contract formation, most easily defined by the way in which the user

4  purportedly gives their assent to be bound by the associated terms: browsewraps,

5  clickwraps, scrollwraps, and sign-in wraps." *Blizzard*, 76 Cal.App.5th at 945

6  (cleaned up); *see also Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014

7  (9th Cir. 2024).

8      A browsewrap agreement "is one in which an internet user accepts a

9  website's terms of use merely by browsing the use. Unlike a clickwrap agreement, a

10  browsewrap agreement does not require the user to manifest assent to the terms and

11  conditions expressly. A party instead gives his assent simply by using the website

12  which typically contains a hyperlink somewhere on the page leading to a separate

13  page containing the terms of use to which the owner intends to bind the user."

14  *Blizzard*, 76 Cal.App.5th at 945 (cleaned up); *Keebaugh*, 100 F.4th at 1014.

15      A clickwrap agreement "is one in which an internet user accepts a website's

16  terms of use by clicking an 'I agree' or 'I accept' button, with a link to the

17  agreement readily available." *Blizzard*, 76 Cal.App.5th at 945 (cleaned up);

18  *Keebaugh*, 100 F.4th at 1014.

19      A sign-in wrap agreement "is a blend or hybrid of browsewrap and clickwrap

20  agreements. Sign-in wrap agreements are those in which a user signs up to use an

21  internet product or service, and the sign-up screen states that acceptance of a

22  separate agreement is required before the user can access the service. While a link

23  to the separate agreement is provided, users are not required to indicate that they

24  have read the agreement's terms before signing up. Instead, the website is designed

25  so that a user is notified of the existence and applicability of the site's terms of use

26  usually by a textual notice when proceeding through the website's sign-in or login

27  process." *Blizzard*, 76 Cal.App.5th at 945-46 (cleaned up).

28  ///

"The wrap methods of online contract-formation provide varying degrees of notice to users, with browsewrap providing the least and scrollwrap providing the most." *Blizzard*, 76 Cal.App.5th at 946. Courts "have reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding scrollwrap and clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable. *Id.*

### i. The Transactional Context Strongly Supports the Existence of a Binding Agreement between Plaintiff and Wantable

In determining the enforceability of a sign-in wrap agreement, "the transactional context is an important factor to consider and is key to determining the expectations of a typical consumer." *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 481 (2022). On the one hand, "when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship such as buying a single flower arrangement or pair of socks, downloading free software, or signing up for a free trial, the consumer is less likely to be looking for contractual terms." *Blizzard*, 76 Cal.App.5th at 947 (cleaned up). On the other, courts have typically found sign-in wrap agreements enforceable where a consumer "sign[s] up for an *ongoing* account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship governed by terms and conditions." *Blizzard*, 76 Cal.App.5th at p. 951 (cleaned up) (emphasis in original).

Here, the transactional context strongly supports the existence of a binding sign-in wrap agreement between Plaintiff and Wantable. Plaintiff signed up for a subscription with Wantable that included recurring monthly charges. (Doc. 1, ¶¶ 1, 18, 29.) She signed up for an account, selected the type of subscription (Sleep & Body), then purchased the subscription plan with her credit card. (Doc. 1 at 6-12.) This was not a one-time transaction or some kind of free trial. (*Compare Sellers*, 73 Cal.App.5th at 478 [transactional context did not support enforceability of sign-in

wrap where plaintiffs had merely signed up "for a $5 trial," but were instead "enrolled in a costly monthly membership"].) It was instead a situation where Plaintiff signed up "for an *ongoing* account," under which it is reasonable to expect that Plaintiff would have "contemplate[d] entering into a continuing, forward-looking relationship governed by terms and conditions." *Blizzard*, 76 Cal.App.5th at p. 951.

### ii.     *Wantable's Check Out Page Provided Plaintiff With Reasonable Notice of Wantable's Terms & Conditions*

To sign up for a Wantable subscription, a website visitor must first sign up for an account. (Jaeschke Decl., ¶ 4, Ex. 1.) Once the user has created an account, the website prompts the user to complete a questionnaire which records the user's sizing, measurements, and other preferences. The user must then enroll in a subscription plan, which includes specifying the frequency with which the subscription boxes are to be delivered. (Jaeschke Decl.. ¶ 4, Ex. 2.) Once these tasks are complete, the user may place their first order. The subscription is not active until the user completes the secure checkout process. To complete the checkout process, users must click an orange "Place Order" button. Next to the button is the following notice: "By clicking 'place order' you accept monthly recurring orders and our Terms & Conditions. Your recurring orders can be canceled anytime from your account, email, or by calling us." (Jaeschke Decl., ¶¶ 6-7, Ex. 4.) Terms & Conditions is in orange. The surrounding text is black. (Jaeschke Decl., Ex. 4.) "Terms & Conditions" is a hyperlink which takes users to the full terms and conditions. (Jaeschke Decl., ¶ 8.)

Courts have routinely found that similarly designed processes, in similar transactional contexts, result in the formation of binding terms of use. For instance, in *Blizzard*, the plaintiff "needed an account on Blizzard's online platform" in order to access Blizzard's services. *Blizzard*, 76 Cal.App.5th at 937. To create an account, the user was required to enter their email address and other information and click,

"Create a Free Account." *Id.* Immediately above that button was a notice that stated, "By clicking on 'Create a Free Account,' I agree to the Battle.net End User License Agreement and Privacy Policy." *Id.* As here, the words "Battle.net End User License Agreement" hyperlinked to another webpage containing the entire agreement. The court found that Blizzard's webpage layout resulted in the creation of a binding agreement once the plaintiff clicked "Create a Free Account." *Id.*

Similar outcomes were reached in other cases involving similarly formatted account registration or purchase pages. *See*, *e.g.*, *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *5 (C.D. Cal. June 24, 2021) (consumer accepted Terms of Service by creating an account where ;"the user is provided the opportunity to review the terms… in the form of a hyperlink immediately above or below a button that must be clicked to affirmatively acknowledge the terms, place an order, or register for an account"); *Rodriguez v. Experian Servs. Corp.*, 2015 WL 12656919, at *1-*2 (C.D. Cal. Oct. 5, 2015) (finding assent to terms where "website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgement, which stated, 'By clicking the button above… you agree to our Terms of Use'"); *White v. Ring LLC*, 2023 WL 1097554, at *4 (C.D. Cal. Jan. 25, 2023) (plaintiff accepted Terms of Service by clicking "Purchase" button immediately to the left of which was a notice stating, "by continuing, you agree to Ring's Terms of Service"); *Maynez v. Walmart, Inc.*, 479 F.Supp.3d 890, 895 (C.D. Cal. 2020) (plaintiff agreed to terms by clicking "Place Order" button above which there was a notice that, "By clicking Place Order, you agree to Walmart's Updated Privacy Policy and Terms of Use."); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014-15 (9th Cir. 2024) (plaintiff agree to terms by clicking "Play" where there was a notice next to button stating "By tapping 'Play,' I agree to the Terms of Service").

///

///

### iii.    *Plaintiff Manifested Assent to Wantable's Terms*

"Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *HM DG, Inc. v. Amini*, 219 Cal.App.4th 1100, 1109 (2013). Assent has been found where an Internet user proceeds to complete an internet order, or signs up for an account, after being provided reasonable notice of the website's terms of use. *See, e.g.*, *Cordas v. Uber Techs.*, *Inc.*, 228 F.Supp.3d 985, 990-91 (N.D. Cal. 2017); *Crawford v. Beachbody, LLC*, No. 14cv1583-GPC-KSC, 2014 WL 6606563 (S.D. Cal. Nov. 5. 2014). Assent is also manifested where an offerree accepts the consideration or benefits provided under a contract. *See* Civ. Code, § 1584 ("acceptance of the consideration offered with a proposal, is an acceptance of the proposal"); *see also Harris v. TAP Worldwide, LLC*, 248 Cal.App.4th 373, 384 (2016) ("assent to an offer can occur either by way of performance under the contract or acceptance of the consideration"). Finally, assent has been found through an offeree's inaction, such as failure to opt out of an agreement after being provided notice of it. *Golden Eagles Ins. Co. v. Foremost Ins. Co.*, 20 Cal.App.4th 1372, 1387 (1993) ("silence or inaction operates as an acceptance where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer") (internal quotations omitted).

Here, Plaintiff manifested assent by completing the secure checkout process for a subscription after being provided reasonable notice that, by doing so, Plaintiff was agreeing to Wantable's T&Cs. Plaintiff (1) sought out and visited Wantable's website, (2) created an accounted by providing name, email, and password and clicking "Sign Up," (3) selected a monthly subscription plan, (4) clicked "Place Order," and (5) obtained and retained the benefit of Wantable's styling services that are only available to members who have registered, subscription, and accepted

1  Wantable's T&Cs. (Jaeschke Decl., pp. 2-5; Sobrilsky Decl., ¶ 7.)

2       These affirmative actions taken by Plaintiff bind them to Wantable's T&Cs.

3  If Plaintiff had not placed a subscription order, Plaintiff would not have agreed to

4  Wantable's T&Cs. As discussed above, Plaintiff was provided with reasonable

5  notice of Wantable's T&Cs before taking these actions, resulting in the formation

6  of a binding contract.

7       to review the agreement, to which she is now bound.

8    **B.    <u>Plaintiff Cannot Rebut the Presumption That the Forum Selection</u>**

9         **<u>Clause is Valid</u>**

10      "[F]orum selection clauses are presumptively valid" and "should be honored

11  absent some compelling and countervailing reason." *Murphy v. Schneider Nat'l,*

12  *Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004) (citing *M/S Bremen, supra,* 407 U.S. at 10

13  (internal quotations omitted). The party challenging the clause bears a "heavy

14  burden of proof" and must "clearly show that enforcement would be unreasonable

15  and unjust, or that the clause was invalid for such reasons as fraud or

16  overreaching." *M/S Bremen, supra,* 407 U.S. 1 at 15, 17. To that end, it is

17  noteworthy that "[the] plaintiff's subsequent choice of forum merits no weight,"

18  and "a court must deem all factors relating to the private interests of the parties . . .

19  entirely in the favor of the preselected forum." *Yei A. Sun v. Advanced China*

20  *Healthcare, Inc.,* 901 F.3d. 1081, 1088-89 (9th Cir. 2018) (internal citations

21  omitted).

22      There are only three limited reasons a forum selection clause may be deemed

23  unenforceable: (1) the inclusion of the clause in the agreement was the product of

24  "fraud or overreaching," (2) the plaintiff seeking to repudiate the clause "would

25  effectively be deprived of his day in court were the clause enforced," and

26  (3) "enforcement would contravene a strong public policy of the forum in which

27  suit is brought." *Richards v. Lloyd's of London*, 135 F.3d 1289, 1294, 1297 (9th

28  Cir. 1998). None of the bases for invalidating the clause apply here, and Plaintiff

cannot make the requisite "clear showing" that the forum selection clause is in any way unreasonable or unjust. In contrast, this Court has ample reasons to enforce the forum selection clause.

### i.     The Forum Selection Clause Applies to Plaintiff's Claims

First, Wantable's T&Cs clearly encompass Plaintiff's claims, which arise out of and relate to Plaintiff's acts of accessing Wantable's Website and making a purchase. (Complaint, ¶ 29.) Specifically, Section 24 of the T&Cs entitled "Disputes" broadly covers "[a]ny dispute relating in any way to your visit to, or use of, the Site or the App, to the products you purchase through the Site (including a subscription), or to your relationship to Wantable." (Jaeschke Decl., ¶ 11, Ex. 5, Section 24.) Plaintiff's claims thus fall under the purview of the T&Cs.

### ii.     There is no Evidence of Fraud or Overreaching

Second, the forum selection clause was not procured through fraud or overreaching, and Plaintiff cannot prove the contrary. To establish that Wantable committed fraud, Plaintiff must make a "clear showing" that Wantable knowingly made a false representation to her with the intent to defraud her and that Plaintiff justifiably relied on the misrepresentation, resulting in damage. *See, M/S Bremen, supra,* 407 U.S. 1 at 10; *see, Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F.Supp.3d 1123, 1134 (S.D. Cal. 2014). The Complaint is entirely devoid of any allegations suggesting fraud.

Here, Wantable provided Plaintiff with adequate notice of its T&Cs. The hyperlink of the T&Cs was clearly and conspicuously displayed in underlined orange font, setting it apart from the rest of the black text of the paragraph: "By clicking 'place order' you accept monthly recurring orders and our Terms & Conditions..." Importantly, the hyperlink was unobstructed and visible to Plaintiff prior to her completion of the first online order, giving Plaintiff many opportunities to click the hyperlink and review the full text of the T&Cs before placing her order. In fact, the beginning text of the T&Cs explicitly advised Plaintiff that:

> By accessing, browsing or using this Site, you acknowledge that you have read, understood and agreed to be bound by these Terms of Use (these "Terms"). <u>If you do not agree to these Terms, you should not use or access this Site</u> or the App…You are encouraged to review these Terms each time you use the Site or because your use of the Site after the posting of changes will constitute your acceptance of the changes.

(Ex. 5, p. 1, para. 2, emphasis added.) Accordingly, Wantable made no false representations to induce Plaintiff to assent to the T&Cs.

To the extent Plaintiff intends to argue there was no "equal bargaining power" and that Plaintiff could not negotiate the terms of T&Cs and specifically, Section 24 on Disputes, such argument is unavailing given legal precedent holding the contrary. *See e.g., Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 593 (1991) ("a nonnegotiated forum-selection clause in a form ticket contract [is not unenforceable] simply because it is not the subject of bargaining."); *Murphy, supra,* 362 F.3d at 1141 (finding no fraud or overreaching that would prohibit enforcement of a forum selection clause in a dispute between a truck and a trucking company when the driver could have contracted elsewhere).

### iii.    The Forum Selection Clause Does not Deny Plaintiff her day in Court

Third, the inconvenience attributable to litigating outside a party's home forum does not qualify as a "serious" inconvenience that would effectively "deprive [a] party of [her] day in court." *M/S Bremen, supra,* 407 U.S. 1 at 17-18. In fact, Ninth Circuit courts have routinely upheld forum selection clauses that mandate litigation in other countries, let alone other federal districts. *See, Russel v. De Los Suenos*, No. 13-CV-2081-BEN-DHB, 2014 WL 1028882, at *7 (S.D. Cal. 2014) (stating "courts have often enforced forum selection clauses even where litigation would be difficult and inconvenient" and that the "courts have previously enforced

1  forum selection clauses requiring litigation in Mexico and other countries"). *See*

2  *also Spradlin v. Lear Siegler Management Services Co., Inc.*, 926 F.2d 865, 869

3  (9th Cir. 1991) (enforcing a forum selection clause in an employment contract

4  requiring the plaintiff, a California resident, to litigate his employment dispute

5  Saudi Arabia).

6      Further, to the extent Plaintiff might argue that transferring this matter to the

7  Eastern District of Wisconsin would effectively bar Plaintiff from asserting causes

8  of action under California law, a transfer of this action is not the equivalent of a

9  judgment on the merits.[2] Still, the United States Supreme Court has held that "a

10  plaintiff who files suit in violation of a forum-selection clause enjoys no [ ]

11  'privilege' with respect to its choice of forum, and therefore it is entitled to no

12  concomitant 'state-law advantages.'" *Atlantic Marine Const. Co., Inc., supra,* 571

13  U.S. at 65. Here, Plaintiff cannot argue that she would be deprived of her day in

14  Court when she intentionally filed in the wrong forum to avail herself of California

15  law, in violation of the parties' agreement.

16      **iv.    Enforcement of the Forum Selection Clause Would not**

17           **Violate Public Policy**

18      Lastly, enforcing the forum selection clause in Wantable's T&Cs would not

19  violate the public policy of California. To that end, it should be noted the Supreme

20  Court has made clear that traditional public interest factors will "rarely defeat a

21  transfer motion[.]" *Atlantic Marine Const. Co., Inc., supra,* 571 U.S. at 65. Still,

22  "California law, like federal law, generally favors the enforcement of forum

23  selection clauses." *Meras Engineering, Inc. v. CH2O, Inc.,* 2013 WL 146341, at

24  *11 (N.D. Cal. Jan. 14, 2013). This is because "enforcement of a freely negotiated

25  forum selection clause comports with established notions of freedom of contract

26

27  [2] As discussed in Section V, *supra,* Wantable will petition the Eastern District for
    an order compelling Plaintiff to arbitrate her claims. As Wantable will argue

28  therein, the issue of arbitrability as well as merits issues like conflicts on choice-of-
    law should be deferred to the arbitrator pursuant to Section 24 of the T&Cs.

and allows parties in routine commercial transactions to eliminate the uncertainties of where litigation will take place." *Pelleport Investors, Inc. v. Budco Quality Theatres, Inc*., 741 F.2d 273, 280 (9th Cir. 1984). Indeed, the refusal to enforce the forum selection clause would irreparably damage the goal of judicial economy, as it would give way to multiple, competing decisions across the various jurisdictions causing litigation chaos. As such, public policy considerations weigh in favor of enforcing the parties' forum selection clause.

Plaintiff's choice to litigate in California is entitled to no weight under binding Supreme Court precedent. Accordingly, this Court should hold Plaintiff to the terms she agreed to be bound by and transfer this action to the Eastern District of Wisconsin.

## V.    IN THE ALTERNATIVE, THIS COURT SHOULD STAY THE ACTION PENDING WANTABLE'S PETITION TO COMPEL ARBITRATION IN THE EASTERN DISTRICT OF WISCONSIN

In the alternative, Wantable requests a stay of this action so that it may file a petition to compel arbitration in the Eastern District of Wisconsin which, under the Federal Arbitration Act ("FAA"), is the only federal court with authority to compel arbitration to take place in Milwaukee, Wisconsin.

Section 4 of the FAA ("Section 4") provides that "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement," but that the arbitration proceedings "shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4 (emphasis added). Consistent with the unambiguous language of Section 4, Ninth Circuit precedent going back to 1941 consistently prohibits a district court from ordering parties to arbitrate outside of the district in which a motion to compel arbitration is filed.

For example, in *Continental Grain Co. v. Dant & Russell, Inc.*, 118 F.2d 967 (9th Cir. 1941), the Ninth Circuit considered a petition filed in Oregon seeking to

compel arbitration in New York, the designated forum in the contract's forum selection clause. *Id*. at 968. Based on the plain language of Section 4, the Ninth Circuit affirmed the district court's order compelling arbitration in Oregon even though the parties' agreement had identified New York as the chosen arbitration forum. *Id.* at 968-69. *See also, Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781,785 (9th Cir. 2001) ("[the] plain language [of Section 4] … confines the arbitration to the district in which the petition to compel is filed," citing *Continental Grain*).

Consistent with *Continental Grain*, district courts in the Ninth Circuit "regularly find that section 4 of the FAA limits a court to ordering arbitration within the district in which the petition to compel was filed." *Seaman v. Priv. Placement Cap. Notes II, LLC*, 2017 U.S. Dist. LEXIS 47121 at *5 (S.D. Cal. Mar. 29, 2017) (collecting cases; holds that FAA prevents it from ordering arbitration outside its District); *Allied Professionals Ins. Co. v. Harmon*, 2017 U.S. Dist. LEXIS 216872 at *6 (C.D. Cal. July 28, 2017) ("Because a district court can compel an arbitration to occur only in its district, the selection of a forum for arbitration would be rendered meaningless if it did not also embody consent to enforce the arbitration agreement in that jurisdiction's courts.")

Accordingly, the Eastern District of Wisconsin is the only venue in which Wantable may enforce its arbitration agreement, which provides for arbitration in Milwaukee, Wisconsin. Thus, this Court should transfer the action to the Eastern District or issue a stay to preserve Wantable's ability to enforce its contractual defenses.

///
///
///
///
///

1    **VI.    CONCLUSION**

2            For the foregoing reasons, Defendant Wantable, Inc. respectfully requests

3    that this Court transfer the action to the Eastern District of Wisconsin.

4    Alternatively, Wantable requests a stay of this matter until its petition to compel

5    arbitration is heard by the Eastern District of Wisconsin.

6

7    DATED:  February 18, 2026          BUCHALTER
                                        A Professional Corporation
8

9
                                    By: _____
10                                        CHRISTINA M. MORGAN
                                          ARTIN BETPERA
11                                        TRICIA A. PHAM
                                          Attorneys for Defendant
12                                        WANTABLE, INC., a Wisconsin
                                          corporation, d/b/a
13                                        WWW.WANTABLE.COM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28